IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

BURNIS MORTON, JR.,        )
        )
        Plaintiff,    )
        )
     -versus-     )     Civil Action No.: 1:04CV00867
        )
JO ANNE B. BARNHART,     )
Commissioner of Social Security,  )
        )
        Defendant.  )

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

Plaintiff, Burnis Morton, Jr., brought this action pursuant to Section 205(g) of the Social Security Act, as amended (42 U.S.C. § 405(g)), to obtain judicial review of a final decision of the Commissioner of Social Security denying his claim for Disability Insurance Benefits under Title II of the Social Security Act (the "Act").[1] The parties have filed cross-motions for judgment, and the administrative record has been certified to the court for review.

**Procedural History**

Plaintiff filed an application for Disability Insurance Benefits on April 5, 2001 (protective filing date, March 16, 2001), alleging a disability onset date of

_____

[1]   The Social Security Disability Insurance Program was established by Title II of the Act, 49 Stat. 622 (codified at 42 U.S.C. § 401 et seq.).

November 9, 2000.[2]  Tr. 63, 64.  The application was denied initially and upon reconsideration.  Tr. 46, 47.  Plaintiff requested a hearing de novo before an Administrative Law Judge (ALJ).  Tr. 57.  Present at the hearing, held on January 14, 2003, were Plaintiff, his attorney, his wife, and a vocational expert (VE).  Tr. 322.

By decision dated February 20, 2003, the ALJ determined that Plaintiff was not disabled within the meaning of the Act.  Tr. 21.  On July 23, 2004, the Appeals Council denied Plaintiff's request for review of the ALJ's decision (Tr. 5), thereby making the ALJ's determination the Commissioner's final decision for purposes of judicial review.

In deciding that Plaintiff is not entitled to benefits, the ALJ made the following findings, which have been adopted by the Commissioner:

> 1.    The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through the date of this decision.
>
> 2.    The claimant has not engaged in substantial gainful activity since the alleged onset of disability.
>
> 3.    The medical evidence establishes that the claimant has obesity, hypertension, degenerative disc disease with chronic back pain, sleep apnea, depression, and anxiety [sic], impairments considered "severe" based on the requirements in the Regulations 20 CFR § 416.920(b).[3]
>
> 4.    These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P,

---

[2]    Plaintiff subsequently amended this date to November 1, 2000.  See Tr. 68.

[3]    This cite should be to 20 C.F.R. § 404.1520(b).

2

Regulation No. 4. The claimant's depression and anxiety impose moderate limitations in daily activities, social functioning, and in concentration, persistence, and pace. The claimant has not experienced any extended episodes of decompensation. The claimant's depression and anxiety are not of the level of severity required to satisfy the C criteria of Listings 12.04 and 12.06.

5. I find the claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision.

6. I have carefully considered all of the medical opinions in the record regarding the severity of the claimant's impairments (20 CFR § 404.1527).

7. The claimant has the following residual functional capacity: "sedentary" and "light" work which does not require climbing or work around hazardous equipment or at unprotected heights, which does not require more than occasional bending or stooping, and which requires the performance of only simple, routine, repetitive tasks, and working with things and not people in a low stress environment.

8. The claimant is unable to perform any of his past relevant work (20 CFR § 404.1565).

9. The claimant is a "younger individual" (20 CFR § 404.1563).

10. The claimant has a "limited" education (20 CFR § 404.1564).

11. The claimant has "unskilled" and "semi-skilled" work with no acquired skills from "semi-skilled" work previously performed which are transferable to other jobs within his residual functional capacity (20 CFR § 404.1568).

12. Although the claimant's exertional limitations do not allow him to perform the full range of "sedentary" and "light" work, using Medical-Vocational Rules 201.25 and 202.18, in conjunction with the testimony of the vocational expert, as a framework for decision-making, there are a significant number of jobs in the national economy that he could perform. Examples of such jobs include work as a hand sander (over 1160 positions available in North Carolina), an assembler of small products (over 1000 positions available in North Carolina), a getter [sic]

(over 5735 positions available in North Carolina), and a dowel inspector (over 2400 positions available in North Carolina).

13. The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR § 404.1520(f)).

Tr. 30-32 (footnote added).

## Analysis

In his brief before the court, Plaintiff argues the Commissioner's findings are in error because the ALJ mistakenly analyzed his residual functional capacity and credibility, and failed to carry his burden at step five of the sequential evaluation. The Commissioner contends otherwise and urges that substantial evidence supports the determination that Plaintiff was not disabled.

### Scope of Review

The Act provides that, for "eligible"[4] individuals, benefits shall be available to those who are "under a disability," defined in the Act as the inability:

to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, the Social Security Administration ("SSA"), by regulation, has reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must determine

---

[4]    Eligibility requirements for disability benefits are found at 42 U.S.C. § 423(a)(1).

4

whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment which equals an illness contained in the Act's Listing of Impairments, (4) has an impairment which prevents past relevant work, and (5) has an impairment which prevents him from doing any other work. 20 C.F.R. § 404.1520.

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. Richardson v. Perales, 402 U.S. 389 (1971); Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a de novo review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. See Pyles v. Bowen, 849 F.2d 846, 848 (4th Cir. 1988) (citing Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir. 1986)); see also Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (the issue before the court is not whether the claimant is disabled, but whether the ALJ's finding that she is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law).

Substantial evidence is:

"evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'"

5

Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings, and that this conclusion is rational. Thomas v. Celebrezze, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1972).

Pertinent Evidence Presented

As of the date of the ALJ's decision, Plaintiff was forty-four years of age. Tr. 25. The ALJ found that Plaintiff has a ninth grade education and past relevant work (PRW) as an aluminum welder, house painter, and machine operator. According to the ALJ, Plaintiff alleged disability due to due to pain, stiffness, and spasms in his low back due to arthritis; panic attacks two to three times daily, during which he becomes dizzy and "lightheaded"; high blood pressure; and sleep apnea. Id.

The ALJ found that Plaintiff had not engaged in substantial gainful activity after his alleged onset of disability (AOD). He also determined that Plaintiff met the disability insured status requirements of the Act through the date of the decision. Further, the ALJ found the medical evidence to establish that Plaintiff suffered from several severe impairments. He concluded, nevertheless, that none of these impairments met or equaled any of the Listing of Impairments.

6

1. Residual Functional Capacity

Plaintiff actually has several problems with the ALJ's analysis of his residual functional capacity (RFC), but he essentially asks the ALJ to go beyond the minimal record. He alleges first that the ALJ failed to perform a function-by-function assessment as required by Social Security Ruling (SSR) 96-8p, 61 Fed. Reg. 34474.

Ruling 96-8p sets forth SSA's policies and policy interpretations for the assessment of RFC for disability claimants. Id. It explains that this assessment "must address both the remaining exertional and nonexertional capacities of the individual." Id. at 34477. The Ruling provides that "exertional capacity" is "an individual's limitations and restrictions of physical strength and defines the individual's remaining abilities to perform each of seven strength demands: Sitting, standing, walking, lifting, carrying, pushing, and pulling. Each function must be considered separately." Id.

In the Ruling, SSA also sets out its "Narrative Discussion Requirements" for the RFC assessment, mandating a description of how the evidence supports each conclusion, and a discussion of

> the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform *based on the evidence available in the case record.*

Id. at 34478 (footnote omitted; emphasis added).

7

The ALJ first summarized Plaintiff's testimony.  <u>See</u> Tr. 25.  Plaintiff's PRW required him to lift twenty pounds, Tr. 332, and he was unable to work due to pain, stiffness, and spasms in his lower back, Tr. 342.  He had frequent "panic attacks" during which he became dizzy and lightheaded, could not be in crowds, and was sleepy all day.  Tr. 344-45, 340-41.  Plaintiff had difficulty bending and stooping and could not lift over fifteen pounds.  Tr. 342-43.  He could stand for twenty to thirty minutes and, when he walked, his back became stiff.  Tr. 343-44.  Plaintiff has to change positions often. <u>See</u> Tr. 343.  His medication helped his back pain and panic attacks.  Tr. 342, 345-46.

The ALJ next discussed the medical findings.  Tr. 26-27.  In November 2000, Dr. Mark LaVigne diagnosed Plaintiff with dizziness/vertigo.  Tr. 192.  In February 2001, Dr. Timothy Sullivan reported that Plaintiff had sleep apnea and primary insomnia.  Tr. 232.  During the relevant period, the diagnoses of Plaintiff's primary physician, Dr. James Currin, included chronic panic attacks, chronic sciatica, and chronic anxiety.  <u>E.g.</u>, Tr. 316-17.  Dr. Leonard Reaves conducted Plaintiff's consultative physical examination in August 2001.  <u>See</u> Tr. 236-40.  Dr. Reaves concluded that Plaintiff had a history of hypertension, chronic low back pain with postural strain, a report of degenerative disc disease, a depressive reaction, gastroesophageal reflux, sinusitis, and sleep apnea.  Tr. 238.

Based on this record, the ALJ found that Plaintiff could perform both "sedentary" and "light" work which does not require climbing; work around hazardous

8

equipment or at unprotected heights; more than occasional bending or stooping; the performance of more than simple, routine, repetitive tasks; working with people rather than things; or work in other than a low stress environment. Tr. 27-28. The ALJ defined "light" work as requiring "sitting for two hours and standing and walking for six hours during an eight-hour workday, and lifting ten pounds on a regular basis and twenty pounds occasionally." Tr. 29.

Although the ALJ did not provide his findings in the preferred order – separate functions first, then exertional level – he clearly set forth Plaintiff's ability to perform sustained work activities during the course of a eight-hour workday, except for the functions of carrying, pushing, and pulling. Ruling 96-8p, however, specifies that the narrative must be "based on the evidence available in the case record," 61 Fed. Reg. at 34478, and there is no evidence as to Plaintiff's ability to carry, push, and pull. See also id. at 34476 ("[W]hen there is no allegation of a physical or mental limitation or restriction of a specific functional capacity, and no information in the case record that there is such a limitation or restriction, the adjudicator must consider the individual to have no limitation or restriction with respect to that functional capacity.").

Moreover, Plaintiff has failed to allege that he was prejudiced by this lapse. Cf. Brock v. Chater, 84 F.3d 726, 729 (5th Cir. 1996) ("We will not reverse the decision of an ALJ for lack of substantial evidence where the claimant makes no showing that he was prejudiced in any way by the deficiencies he alleges."). As the Ruling explains, the function-by-function assessment is of particular interest at step

4 of the sequential evaluation process "because the first consideration at this step is whether the individual can do [PRW] as he or she actually performed it." Id. at 34476. Also, without this assessment, "it *may* not be possible to determine whether the individual is able to do [PRW] as it is generally performed in the national economy because particular occupations may not require all of the exertional and nonexertional demands necessary to do the full range of work at a given exertional level." Id. (emphasis added). But these concerns are not implicated in the instant case because the ALJ found that Plaintiff could not perform his PRW, either as he performed it or as generally performed in the national economy.

In addition, there is no evidence that the jobs upon which the ALJ relied at step five (see Tr. 31) involve an appreciable amount of carrying, pushing, or pulling. See Dictionary of Occupational Titles[5] §§ 761.684-030, 739.687-030, 706.684-022, 725.687-022, and 669.687-014. Two of these positions, those of getterer and dowel inspector, are classified as sedentary, and "[l]imitations or restrictions on the ability to push or pull will generally have little effect on the unskilled sedentary occupational base." SSR 96-9p, 61 Fed. Reg. 34478, 34481.

Plaintiff next complains that the ALJ was incomplete and selective in his references to the record. He refers first to Dr. Sullivan's statement, which the ALJ *did* cite fully: "Dr. Sullivan stated that he would not actively support permanent disability in the claimant, but rather a continuing trial of temporary disability until his

---

[5] Employment & Training Admin., U.S. Dep't of Labor (4th ed. 1991) [hereinafter DOT].

medical and psychological problems were under control."  Tr. 26 (citing Tr. 233).

Contrary to Plaintiff's suggestion, the ALJ did *not* find that Plaintiff's problems were

"under control"; in fact, he found that Plaintiff suffered from several severe

impairments.[6]

Dr. Sullivan's statement, however, does suggest that Plaintiff's impairments,

if properly treated, would not render him *permanently* disabled.  SSA does not

generally award benefits for temporary disability.  Cf. 20 C.F.R. § 404.1509 ("Unless

your impairment is expected to result in death, it must have lasted or must be

expected to last for a continuous period of at least 12 months.").  And there is

substantial evidence, cited by the ALJ, to support his finding that Plaintiff's

impairments, though severe, do not prevent him from engaging in substantial gainful

activity.

Although apparently unconnected, Plaintiff next argues that he did not comply

with his sleep apnea treatment because he felt like it was suffocating him.  The ALJ

duly noted this explanation.  See Tr. 27.  Later in his decision, the ALJ does cite this

noncompliance in support of his credibility decision, but he also notes, inter alia, Dr.

LaVigne's observation that Plaintiff "was almost noncompliant with his evaluations

_____

[6]    In conjunction with this argument, Plaintiff points out that, after the ALJ's decision, he underwent a mental health evaluation.  See Tr. 319-21.  Although the court does not understand the relevance of this citation, it does note that Plaintiff attended such evaluation almost three years after Dr. Sullivan suggested it, Tr. 231, and ten months after receiving the ALJ's decision.  Further, the evaluator concluded that Plaintiff "is not felt to be in need of treatment at this time."  Tr. 321.

11

and treatment, thereby indicating that his symptoms were not of great concern." Tr. 28.

Plaintiff adds it is unclear that the ALJ adequately considered his obesity, as suggested by Ruling 02-01p. See 67 Fed. Reg. 57859-02, 57862 ("Obesity can cause limitation of function."). The Ruling states that SSA "will explain how we reached our conclusions on whether obesity caused any physical or mental limitations." Id. at 57863.

Again, however, the ALJ had little with which to work. Plaintiff failed to allege his obesity in his Disability Report, see Tr. 72, or to attribute to obesity any limitations. Many months prior to Plaintiff's AOD, Dr. Jonathan Nestor noted that he had been "overweight for years," Tr. 278, yet Plaintiff worked as a welder from 1994 through his AOD, see Tr. 118. Dr. Barrie Hurwitz, while noting that Plaintiff had been "obese for some time," observed that his motor testing revealed good power throughout with normal tone, and his gait and station were steady with normal tandem walking. Tr. 182. Dr. LaVigne described Plaintiff's obesity as "mild." Tr. 189, 192.

Dr. Sullivan's examination revealed that Plaintiff could rise without using his arms; was able to deep-knee bend; had a normal posture for his age; had a normal stride length; could stand on both his heels and his toes; could walk heel to toe; and had five of five power. Tr. 229. Although Dr. Reaves described Plaintiff as obese, Tr. 238, he suggested no limitations stemming therefrom. Plaintiff testified that he

12

had "tried a lot of different prescribed medications from the doctor to lose weight," Tr. 344, but this allegation is not borne out by the record.[7] Even Dr. Currin, who opined that Plaintiff was "totally and completed disabled," Tr. 290, failed to comment on his obesity. The court refuses to find reversible error when Plaintiff has failed to show his obesity in fact caused any limitations. Cf. Pass v. Chater, 65 F.3d 1200, 1203 (4th Cir. 1995) (claimant bears the burden of proof and production through step 4 of the sequential evaluation); 20 C.F.R. § 404.1512(a) ("you must furnish medical and other evidence that we can use to reach conclusions about your medical impairment(s) and ... its effect on your ability to work on a sustained basis").

2. Credibility

In assessing Plaintiff's credibility, the ALJ stated that he had considered Plaintiff's subjective allegations, but determined:

> The totality of the other substantial evidence of record is inconsistent with the claimant's allegations concerning the intensity, persistence, and limiting effects of his symptoms. The claimant testified that he gets some relief from his symptoms with medication. Further, the claimant's credibility is diminished by Dr. LaVigne's statement noting that the claimant was almost noncompliant with his evaluations and treatment, thereby indicating that his symptoms were not of great concern. Additionally, although the claimant reported that a significant number of his problems are due to sleep apnea and anxiety, the evidence indicates, as noted above, that the claimant is noncompliant with recommended evaluation and treatment. Moreover, although the claimant complained about high blood pressure, the documentary

---

[7]    There is one mention of Plaintiff taking Zenacal for weight loss. See Tr. 228. Dr. Nestor "talked" to Plaintiff about the importance of losing weight, Tr. 278, see also Tr. 279, and Dr. Hurwitz "recommended" exercise and weight reduction, Tr. 183.

evidence indicated that the claimant's blood pressure was well controlled with medication.

Tr. 28-29.

Plaintiff again complains that the ALJ was incomplete and selective when evaluating the evidence. He objects that medications only reduced, but did not eliminate, his panic attacks, Tr. 345-46, and back pain, Tr. 342, or only provided temporary relief, Tr. 278.[8] But the ALJ said only that Plaintiff was afforded "some," not total relief, with medication. Tr. 28.

Plaintiff further contends that the ALJ failed to consider that his medications caused side effects; his arguments are not well taken. He refers first to a statement that "[h]e is unable to tolerate Ativan because of the side effects," Tr. 226, but there is no indication that he was still taking Ativan, see, e.g., Tr. 77, 79, 117. Plaintiff next cites to a notation that "[h]e *feels* that the norvasc is making him sleepy," Tr. 278 (emphasis added),[9] but Plaintiff testified that his sleepiness was caused by his sleep apnea, Tr. 341. He also stated, as to his medications, "I think about every one I'm taking says on the bottle they cause drowsiness."[10] Id. But simply because the

---

[8] The court notes this citation is to a record dated February 23, 2000; Plaintiff worked 8 more months thereafter.

[9] See note 8, supra.

[10] The court doubts that every medication is so labeled, although it would believe the labels suggest that the medications *may* cause drowsiness.

14

medication warns that it causes drowsiness does not mean that Plaintiff suffers drowsiness as a result.

Plaintiff argues that "a claimant may not be penalized for failing to seek treatment he cannot afford," Pl.'s Br. at 10, but there is no indication in the record that Plaintiff could not afford recommended treatment. Plaintiff cites his statement to Dr. Reaves that his prescriptions were "very expensive for him," Tr. 238, but there is no indication that Plaintiff failed to follow recommendations because of cost. At his mental health screening, Plaintiff reported that "Dr. Currin would like to prescribe Paxil, but [Plaintiff] cannot afford to fill the prescription." Tr. 320. Yet he added that his present medication prevented his panic attacks. Id. Further, Plaintiff's medical records reveal mostly monthly visits to Dr. Currin.

There is also a dispute about blood pressure, Plaintiff contending "the evidence of record reflects that [it] was 'difficult to control,'" Pl.'s Br. at 10 (citing Tr. 238), and the ALJ asserting otherwise. As the ALJ explained, "documentary evidence" supports a finding that Plaintiff's blood pressure was well controlled with medication.

15

| **2000** | | | | **2001** | | | | **2002** | | |
|---|---|---|---|---|---|---|---|---|---|---|
| *Date* | *Pg* | *BP* | | *Date* | *Pg* | *BP* | | *Date* | *Pg* | *BP* |
| 1/3 | 310 | 140/70 | | 1/23 | 315 | 120/70 | | 1/7 | 160 | 120/70 |
| 2/9 | 316 | 120/70 | | 2/6 | 229 | 142/108[11] | | 2/7 | 297 | 120/70 |
| 3/1 | 166 | 138/80 | | 3/9 | 314 | 120/70 | | 3/7 | 297 | 120/70 |
| 4/15 | 170 | 121/72 | | 4/10 | 314 | 120/70 | | | | |
| 5/30 | 312 | 120/70 | | 5/11 | 314 | 120/70 | | 5/6 | 316 | 120/70 |
| 6/21 | 311 | 120/70 | | 6/12 | 314 | 120/70 | | 6/18 | 316 | 120/70 |
| 7/12 | 180 | 129/77 | | 7/18 | 314 | 120/70 | | 7/18 | 316 | 120/70 |
| 8/9 | 183 | 122/80 | | 8/13 | 313 | 120/70 | | | | |
| 9/26 | 313 | 120/70 | | 9/13 | 313 | 120/70 | | 9/20 | 317 | 120/70 |
| 11/2 | 202 | 128/87 | | 10/11 | 313 | 120/70 | | 10/10 | 317 | 130/70 |
| 11/20 | 316 | 150/80 | | 11/9 | 160 | 120/70 | | 11/19 | 317 | 120/70 |
| 12/22 | 315 | 120/70 | | 12/10 | 160 | 120/70 | | | | |

Plaintiff testified that readings were low because he took his medication in the morning, and his visits with Dr. Currin were "usually" in the morning.  Tr. 347. Although none of the readings taken by Dr. Currin were elevated, those taken by other caregivers were also generally not high.

---

[11]  "Blood pressure below 120 over 80 mmHg (millimeters of mercury) is considered optimal for adults.  A systolic pressure of 120 to 139 mmHg or a diastolic pressure of 80 to 89 mmHg is considered 'prehypertension' and needs to be watched carefully.  A blood pressure reading of 140 over 90 or higher is considered elevated (high)."  American Heart Ass'n, "Blood Pressure," at http://www.americanheart.org/presenter.jhtml?identifier=4473 (last visited October 4, 2005).  This reading is the only one that is considered "high" under the American Heart Association standard.

| Date | Pg | Caregiver | BP |
|---|---|---|---|
| 2/23/00 | 278 | Dr. Nestor | 130/86 |
| 3/1/00 | 166 | Dr. Jeffrey Seder | 138/80 |
| 3/14/00 | 279 | Dr. Nestor | 130/90 |
| 4/15/00 | 170 | Scotland ER | 121/72[12] |
| 7/12/00 | 180 | Scotland ER | 129/77[13] |
| 8/9/00 | 183 | Dr. Hurwitz | 122/80 |
| 11/1/00 | 207 | Scotland ER | 126/65 |
| 11/1/00 | 204 | Scotland Mem. | 140/70 |
| 11/2/00 | 202 | Scotland Mem. | 128/87 |
| 2/6/01 | 229 | Dr. Sullivan | 142/108[11] |
| 8/30/01[14] | 237 | Dr. Reaves | 128/96 |

Accordingly, the court finds there is more than substantial evidence to uphold the ALJ's finding that Plaintiff's blood pressure was well controlled.

Plaintiff next alleges that the ALJ failed to evaluate his credibility in accordance with Ruling 96-7p, 61 Fed. Reg. 34483. This Ruling provides that, when the claimant's statements about his pain or other symptoms are not substantiated by objective medical evidence, as in Plaintiff's case, "the adjudicator must make a

---

[12]  This reading was taken at approximately 2:10 a.m.

[13]  This reading was taken at approximately 1:50 a.m.

[14]  With the exception of a February 7, 2002, finger x-ray, and the October 2003 mental health evaluation, this is Plaintiff's last medical record from a caregiver other than Dr. Currin.

finding on the credibility of the individual's statements based on a consideration of

the entire case record," id. at 34485, utilizing the factors listed in the regulations:

(I)   Your daily activities;
(ii)  The location, duration, frequency, and intensity of your pain or
      other symptoms;
(iii) Precipitating and aggravating factors;
(iv)  The type, dosage, effectiveness, and side effects of any
      medication you take or have taken to alleviate your pain or other
      symptoms;
(v)   Treatment, other than medication, you receive or have received for
      relief of your pain or other symptoms;
(vi)  Any measures you use or have used to relieve your pain or other
      symptoms (e.g., lying flat on your back, standing for 15 to 20
      minutes every hour, sleeping on a board, etc.); and
(vii) Other factors concerning your functional limitations and restrictions
      due to pain or other symptoms.

20 C.F.R. § 404.1529(c)(4).

The court finds well-advised, however, the stance of the Eighth Circuit Court

of Appeals that, "[i]f the ALJ discredits a claimant's credibility and gives a good

reason for doing so, we will defer to its judgment even if every factor is not discussed

in depth." Dunahoo v. Apfel, 241 F.3d 1033, 1038 (8th Cir. 2001) (citing Brown v.

Chater, 87 F.3d 963, 966 (8th Cir. 1996)).  After all,

> The ALJ enjoys an institutional advantage in making the type of
> determination at issue here.  Not only does an ALJ see far more social
> security cases than do appellate judges, he or she is uniquely able to
> observe the demeanor and gauge the physical abilities of the claimant
> in a direct and unmediated fashion.  As a result, the ALJ's credibility
> findings warrant particular deference.

White v. Massanari, 271 F.3d 1256, 1262 (10th Cir. 2001).  See also Rice v.

Barnhart, 384 F.3d 363, 371 (7th Cir. 2004) ("as a factual finding, credibility

18

determinations are due special deference"); <u>Reefer v. Barnhart</u>, 326 F.3d 376, 380 (3rd Cir. 2003) (according deference "to an ALJ's credibility determination because he or she has the opportunity at a hearing to assess a witness's demeanor"); <u>Estes v. Barnhart</u>, 275 F.3d 722, 724 (8th Cir. 2002) ("The ALJ is in the best position to gauge the credibility of testimony and is granted deference in that regard.").

The ALJ discussed Plaintiff's testimony as to his activities of daily living (ADLs), which essentially consist of watching television.  Tr. 25.  He also listed Plaintiff's complaints of pain, stiffness, spasms, panic attacks, high blood pressure, sleep apnea, and fatigue.  The ALJ explained that Plaintiff could not be in crowds, because of  his panic attacks; was sleepy all day, due to his sleep apnea; and when he walks, his back becomes stiff.

The ALJ continued that Plaintiff takes medication for his high blood pressure; for his back pain, which helps "some"; and for his panic attacks, which also helps, but does not eliminate them.  <u>Id.</u>  He later noted, however, that Dr. Currin found Plaintiff's back pain to be "well controlled."  Tr. 27.  The ALJ duly recited Plaintiff's comment to Dr. Reaves that he had failed to respond to the CPAP[15] device, "and he thought it was going to suffocate him."  <u>Id.</u> (citing Tr. 236).

---

[15]  An abbreviation of "continuous positive airway pressure," CPAP is "a technique of respiratory therapy, in either spontaneously breathing or mechanically ventilated patients, in which airway pressure is maintained above atmospheric pressure throughout the respiratory cycle by pressurization of the ventilatory circuit."  <u>Stedmans Medical Dictionary</u> 421, 1442 (27th ed. 2000).

19

The ALJ thoroughly summarized Plaintiff's treatment, including Dr. LaVigne's observation that Plaintiff "was almost noncompliant in his pursuit of evaluations and therapy, which suggested that the claimant was not overly concerned with his problem," and Dr. Sullivan's position that he would not support permanent disability for Plaintiff. Tr. 26. In fact, Dr. Sullivan suggested Vocational Rehabilitation. Id. (citing Tr. 233).

As to Plaintiff's limitations, the ALJ repeated Plaintiff's statements that he could not work due to pain, stiffness, and back spasms; his panic attacks cause dizziness and lightheadedness; he had difficulty bending and stooping, and could not lift over fifteen pounds; he could stand for only twenty to thirty minutes; he had to change positions frequently; he could not be in crowds; and he is sleepy all day. Accordingly, the court finds that the ALJ considered all of the factors listed by Ruling 96-7p.[16]

In his argument, Plaintiff relies mostly on his minimal ADLs, but the ALJ discussed these, and did not directly dispute them in his credibility finding. In his decision, the ALJ did *not* find that Plaintiff was totally unaffected by his impairments, but rather, "acknowledge[d] that the claimant has some limitations due to his impairments." Tr. 29. Additionally, the ALJ found that there was "substantial evidence of record" that was "inconsistent with [Plaintiff]'s allegations concerning the

---

[16] In his Reply Brief, Plaintiff argues that the ALJ did not address the duration, frequency, and intensity of his pain, but neither did Plaintiff specify what evidence the ALJ omitted.

intensity, persistence, and limiting effects of his symptoms," Tr. 28, and that he did "not find persuasive the claimant's allegations of inability to perform any work." Tr. 29. Although this court may have come to a different conclusion, it is not authorized, on review, to reweigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. See Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

3. Step Five

Last of all, Plaintiff contends that the jobs listed by the VE and adopted by the ALJ in his decision do not comply with the RFC restriction of a "low stress environment." SSA, however, has determined that VE testimony can be relied upon because VEs are recognized as

> persons who have, through training and experience in vocational counseling or placement, an up-to-date knowledge of job requirements, occupational characteristics and working conditions, and a familiarity with the personal attributes and skills necessary to function in various jobs.

Wilson v. Califano, 617 F.2d 1050, 1053 (4th Cir. 1980). See also SSR 83-14, Soc. Sec. Rep. Serv., Rulings 1983-1991 (West 1992) 41, 45 ("The publications listed in sections 404.1566 ... of the regulations will be sufficient for relatively simple issues. In more complex cases, a person or persons with specialized knowledge would be helpful. State agencies may use personnel termed vocational consultants .... Vocational experts may testify for this purpose at the hearing[.]"). Thus, absent

contrary evidence, the ALJ is justified in relying upon the determination of the VE that the listed jobs are low-stress.

Plaintiff points out that the job of "Sander" "involves attaining precise limits, tolerances, and standards"; that of "Assembler, Small Products I" requires "working under specific instructions"; and a "Dowel Inspector" would have to make judgments and decisions. Pl.'s Br. at 14 (citing DOT §§ 761.684-030, 706.684-022, and 669.687-014). But the court finds *more* informative what the DOT descriptions do *not* include. Under the category of "Temperaments," none of these jobs is designated as "Performing effectively under Stress." See, e.g., DOT §§ 389.687-014 ("Window Cleaner"); 410.674-018 ("Livestock-yard Attendant"). Moreover, the position of getterer provides only for "Performing REPETITIVE or short-cycle work," DOT § 725.687-022, and the VE testified that there were 5,779 such positions in North Carolina, Tr. 353. See, e.g., Long v. Chater, 108 F.3d 185, 188 (8th Cir. 1997) (650 jobs in state was significant number); Trimiar v. Sullivan, 966 F.2d 1326, 1330-32 (10th Cir. 1992) (650-1,000 jobs in state a significant number); Jenkins v. Bowen, 861 F.2d 1083, 1087 (8th Cir. 1988) (500 jobs in region a significant number); Allen v. Bowen, 816 F.2d 600, 602 (11th Cir. 1987) (174 positions in region, 1,600 in state, are significant number). Consequently, the court finds there is no merit to Plaintiff's argument.

22

**Conclusion and Recommendation**

For the foregoing reasons, the decision of the Commissioner is supported by substantial evidence and the correct legal principles were applied. Therefore, IT IS RECOMMENDED that the Commissioner's decision finding no disability be AFFIRMED. To this extent, Plaintiff's motion for summary judgment (Pleading no. 11) seeking a reversal of the Commissioner's decision should be DENIED, Defendant's motion for judgment on the pleadings (Pleading no. 13) should be GRANTED, and this action should be DISMISSED with prejudice.

_____
WALLACE W. DIXON
United States Magistrate Judge

October 14, 2005